IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| STACEY M. WILLIAMS, M.D. | ) | |
| | ) | |
| v. | ) | NO. 3:12-01273 |
| | ) | JUDGE CAMPBELL |
| MICHAEL PYLE | ) | |

**MEMORANDUM**

This case comes before the Court on Defendant's Motion for Summary Judgment (Docket No. 29) and also Defendant's Motion to Exclude Testimony of Plaintiff's Proffered Expert Phillip Davidson (Docket No. 35). For the reasons stated herein, both of Defendant's motions will be DENIED as to Counts I-IV of Plaintiff's Complaint and GRANTED as to Count V of her Complaint, which she has abandoned.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On May 15, 2012, Kennetha Patterson took her 8-day-old daughter for a routine check up with her pediatrician, Dr. Stacey Williams. After the appointment, which was completed around noon, Ms. Patterson placed the baby, who was strapped into her infant car seat, in the back passenger seat facing backward, and then accidentally locked the baby in the car. It was 79 degrees that day. The baby was wearing a jacket and long pants and was under a blanket. The mother noticed that her baby was starting to sweat. She returned to Dr. Williams' office to ask for help, and the office staff called 911 to request assistance. Within a few minutes, the Nashville Fire Department ("NFD") arrived on the scene, bringing paramedics as well. Captain Vincent Rodriguez with the NFD took charge of the scene, and decided to contact Pop-a-Lock, a company that accesses locked vehicles, rather than having an NFD employee break the window.

1

Dr. Williams was unaware of the problem until she left her office to run errands, at which point she saw the fire truck, members of her office staff, and 20 to 30 bystanders. Members of her staff informed Dr. Williams that the baby had been in the car at least 15 minutes. Dr. Williams told Captain Rodriguez that she was the baby's physician. She then informed the Captain that if the baby had been in the car for 15 minutes at the current temperature, the window needed to be broken immediately for the baby's safety. When he indicated he did not intend to break the car window, Dr. Williams asked the mother if she wanted Dr. Williams to break it. The mother told Dr. Williams she did want her to break the window. Dr. Williams went inside her office and retrieved a hammer. When she returned to the car with the hammer, she again asked Captain Rodriguez to break the window so she would not have to, but he again refused.

When Dr. Williams returned to the car, she began to try to strike the front passenger window, but someone grabbed her from behind. She claims that someone from the NFD asked her to go to the driver's side window instead, because it was further from the baby, though Defendant disputes that anyone from the fire department gave Dr. Williams permission to attempt to break the window. Dr. Williams did go to the driver's side and struck the window as hard as she could with the hammer, but the glass did not break. Then a firefighter standing beside her pulled her back. Defendant claims that at some point Jerry Pradines, a paramedic, called Metro Police for assistance, and indicated that Dr. Williams was being confrontational, aggressive, holding the hammer in a way he perceived as threatening, and interfering with the NFD's rescue scene. Dr. Williams vigorously disputes this characterization of her behavior.

Officer Michael Pyle, a police officer employed with the Nashville Metropolitan Police Department, responded to the call. Officer Pyle says that when he arrived, the paramedic pointed out

2

Dr. Williams to him. The parties disagree about what Officer Pyle was told upon arrival about Dr. Williams' role, behavior, and concerns. They also disagree about what Dr. Williams' behavior was after Officer Pyle arrived. Dr. Williams alleges that as she was trying to hit the window again, without having had any interaction with Officer Pyle, someone suddenly pushed her with his full body until she slammed against a wall. Dr. Williams later realized the individual who had pushed her was Officer Pyle. She alleges that she was already hitting the wall when she heard Officer Pyle instruct her to move back to the sidewalk. At some point during this scuffle, Dr. Williams dropped the hammer. The parties do not agree about when and where she dropped the hammer.

According to Dr. Williams, Officer Pyle then pushed her down the sidewalk with her arm twisted behind her back, away from the vehicle and also away from the crowd of bystanders. Dr. Williams and Officer Pyle agree that the bystanders were yelling at him to let Dr. Williams go, which he characterizes as "verbally aggressive." Pyle Depo. 84. Dr. Williams alleges that as the officer was pushing her, she was yelling that she was the baby's doctor. She claims that she was also calling out to the bystanders, imploring them to help get the baby out of the car. She says she told Officer Pyle that she couldn't pull her right arm, which he was holding, back any further, and she says he then yanked it yarder until she "just felt something explode in [her] shoulder." Williams Depo. 101. After that, Officer Pyle caused Dr. Williams' body to hit the sidewalk, using what he refers to as a "push pull maneuver" he had been taught as the Training Academy for taking someone to the ground and gaining control over her. Officer Pyle claims that he felt that Dr. Williams was resisting him, that she might pick up the hammer again and injure someone with it, that she was sweaty and he was having difficulty holding onto her, and that she would go back to the car if she got free. Dr. Williams denies all of these characterizations of her behavior and intentions. She claims that Officer Pyle's

3

actions knocked her onto her knees and that he then dragged her down the sidewalk, scraping her knees. She claims she told him she had a heart condition and was having trouble breathing and that he responded "I don't care." Id. She claims that he then yanked her back up to her feet, but she was unable to regain her footing. After that, she claims that he knocked her to the ground on her left side, which caused her to hit her head on the concrete.

Dr. Williams claims that after Officer Pyle had her on the ground, he put his knee in her back and pushed her head into the concrete. She presents deposition testimony of individuals who claim that he appeared very angry and was very rough with her, even though she was not resisting. She alleges that Officer Pyle told the bystanders more than once to "back the fuck off" or he would put them in handcuffs too. Dr. Williams claims that after he put handcuffs on her, Officer Pyle pushed her again. Once she was in handcuffs, Officer Pyle took her to his police car where she sat in the back seat.

Ultimately, after the baby had been in the car for a total of 25 to 30 minutes and Pop-a-lock still had not arrived, a NFD District Chief who was not on the scene instructed the firefighters to break the window. The baby was transported to Vanderbilt Children's Hospital, where she was found to have an elevated temperature and was diagnosed with heat exhaustion.

Officer Pyle gave Dr. Williams a citation that charged her with disorderly conduct and resisting arrest, and he then allowed her to leave with her husband. On June 1, 2012, the judge presiding over the Davidson County General Sessions Court where Dr. Williams' criminal charges were pending entered an "Order to Withdraw Criminal Citation." The order, which was submitted by the parties, had a note handwritten by the Assistant District Attorney at the bottom which read, "Dr. Williams was acting in a medical emergency."

On December 6, 2012, Dr. Williams filed suit against Officer Pyle bringing claims under 42 U.S.C. § 1983 for the use of unconstitutionally excessive force (Count I) and false arrest and/or seizure (Count II), and also claims under Tennessee state law for reckless infliction of emotional distress (Count III), assault and battery (Count IV), and interference with an emergency care provider (Count V). Plaintiff also brought claims against the Metropolitan Government of Nashville and Davidson County, Tennessee. Based on the parties' filing of a stipulation of dismissal (Docket No. 11), on January 17, 2013 the Court ordered that the Plaintiff's federal claims against Metro be dismissed with prejudice and her state law claims against Metro be dismissed without prejudice (Docket No. 12).

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Pennington v. State Farm Mut. Automobile Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'" *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party is able to meet this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." *Id.* (quoting Fed. R. Civ. P. 56(e)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. *Tolan v. Cotton,* 572 U.S. ---- (2014), 134 S.Ct. 1861, 1866 (2014); *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595 (quoting *Anderson*, 477 U.S. at 252). "As to materiality, the substantive law will identify which facts are material. Only disputes over fact that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## II. Plaintiff's Federal-Law Claims

### A. Qualified Immunity

"To state a claim under 42 U.S.C.§ 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988) and *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994)). Government officials performing discretionary functions pursuant to their employment "are shielded from liability through qualified immunity if they violate an individual's constitutional rights," but the violated right was not "'clearly

6

established" at the time of the official's actions. *Marvin v. Taylor*, 509 F.3d 234, 243 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The defense "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity is *an immunity from suit* rather than a mere defense to liability; and like an absolute immunity it is effectively lost if a case is erroneously permitted to go to trial." *Marvin,* 509 F.3d at 243 (emphasis in original) (quoting *Scott v. Harris,* 550 U.S. 372, 376 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The Supreme Court has set forth a two-part inquiry for determining whether qualified immunity will operate as an "immunity from suit" in a given case. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established, the court must address whether the right was clearly established . . . on a . . . specific level." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that although the sequence set forth in *Saucier* is often appropriate, it is no longer mandatory. *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009).

In undertaking the first inquiry, the Court must "isolate the precise constitutional violation with which the defendant is charged." *Id* at 376 (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979)) (internal quotation marks and brackets omitted). Once the constitutional violation has been isolated, the court must consider "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

right?" *Saucier*, 533 U.S. at 201. If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity" because "the plaintiff's §1983 claim fails as a matter of law and the defendant is therefore entitled to summary judgment and does not need qualified immunity." *Marvin* 509 F.3d at 244 (citing *Scott*, 550 U.S. at 385).

Assuming a constitutional violation is established, the Court must undertake the second inquiry to determine whether the violation was clearly established at the time of the official's actions. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That a violation was clearly established "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelter*, 563 U.S. 730 (2002).

Although *Pearson* gave courts the discretion to decide the order in which to conduct the analysis of the two prongs, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S.Ct. at 1866 (citations omitted). "[T]his is not a rule specific to qualified immunity; it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh th evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (citing *Anderson*, 477 U.S. at 249).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silverstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)); *Austin v. Redford*, 690 F.3d 490, 496 (6th Cir. 2012)).

**B. Fourth Amendment Excessive Force Claim**

**1. Violation of Constitutional Right**

As the Supreme Court held in *Graham v. Connor*, 490 U.S. 386 (1989), *"all* claims that law enforcement officers have used excessive force– deadly or not– in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395 (emphasis in original). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses and immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal citations and punctuation omitted).

In *Scott*, the Supreme Court held that "[a]t the summary judgment stage. . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*. . . the reasonableness of [the officer's] actions is a pure question of law. 50 U.S. at 1776 n. 8 (emphasis in original). But "where the legal question of qualified

immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Bouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (internal quotation and some punctuation omitted).

The facts supporting Plaintiff's excessive force claim, viewed in the light most favorable to her, do establish a violation of her Fourth Amendment rights. The Sixth Circuit has recognized a person's constitutional right to be free from excessive force during an arrest. *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 173 (6th Cir. 2004); *see also Walton v. City of Southfield*, 995 F.2d 1331 (6th Cir. 1993) (finding constitutional right to be free from excessive forced used in handcuffing). In *Solomon*, the Sixth Circuit found that a constitutional violation could have occurred where the Plaintiff's facts showed she had been following a police officer's instruction to walk over toward him when the officer attempted to knock her down and then shoved her into a display case in a movie theater lobby. The Plaintiff further alleged that even though she was not resisting, the officer pushed his hand into her back and his leg into her legs and then grabbed her arm and twisted it behind her with such force that he fractured it. *Id.* In contrast, in the case before this Court, Plaintiff alleges that Defendant had not issued her a single instruction before forcibly knocking her up against a wall, dragging her down a sidewalk, and then knocking her to the ground.

The Court turns to the *Graham* test to assist with determining whether Defendant's conduct was reasonable in the situation he faced. First, the offense for which Plaintiff was being arrested was disorderly conduct. This is the lowest-level misdemeanor offense under Tennessee law. Tenn. Code Ann. § 39-17-305 (establishing disorderly conduct as C misdemeanor); § 40-35-111(e)(3) (establishing that C misdemeanors are punishable by up to 30 days in jail and a $50 fine). This minor offense, which was later withdrawn by the District Attorney's office, was not a severe crime that

would justify the amount of force allegedly used by Defendant. *See Solomon*, 389 F.3d at 174 (holding trespass at movie theater was not a serious enough crime to justify the amount of force employed by officers).

The second *Graham* factor requires consideration of whether the suspect posed an immediate threat to the safety of the officers or others. Defendant is six-feet-one inch tall and weighed approximately 180 pounds, while Plaintiff is about five-feet-two-inches tall. *See id.* (considering the disparity in height and weight of the parties in determining suspect did not pose an immediate threat to officer safety). Also, according to Plaintiff, Defendant did not issue a single instruction to her that she refused to follow. Indeed, according to Plaintiff, before slamming her into the wall, Officer Pyle had no interaction or communication with her at all. Based on Plaintiff's allegations, she did absolutely nothing either before or after the initial slam into the wall that would have justified the force Defendant used against her, but rather was simply a doctor alarmed at what she perceived to be a clear threat to the life of her 8-day-old patient, who had permission from the mother and a NFD employee to try to break the car window and alleviate the danger facing her patient, and who was in the process of trying to do just that when she was attacked by a police officer. According to Plaintiff's version of the facts and the undisputed size differential of the parties, Plaintiff did not pose an immediate threat to the safety of the officers or others. The parties disagree about the facts on whether the hammer posed a safety threat.

The third *Graham* factor asks whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight. Again, according to Plaintiff's evidence, she did nothing to resist or flee.

Viewing the evidence in the light most favorable to Plaintiff, the conduct of the Defendant was not objectively reasonable and therefore violated Plaintiff's Fourth Amendment right to be free of excessive force during an arrest.

### 2. Constitutional Right Clearly Established

The constitutional right to be free from the use of excessive force was clearly established at the time of this incident. As cited above, the Supreme Court held in *Graham v. Connor* that the Fourth Amendment protects individuals from enduring excessive force during arrest. That right is firmly grounded in the text of the Fourth Amendment and in long-standing Supreme Court and Sixth Circuit jurisprudence. *Graham*, 490 U.S. at 393-94, *see also Alkhateeb v. Charter Township of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006) (holding that "the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized"). Plaintiff's allegations that Defendant threw her against a wall, knocked her down, dragged her down the sidewalk scraping her knees, jerked her arm behind her in a way that physically injured her, if believed by a jury, all are clearly established excessive force violations.

The Sixth Circuit also has held that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* Thus, Plaintiff's allegations that Defendant had his knee in her back and pushed her head into the sidewalk while she lay prone on the sidewalk even though she was not resisting and then gave her another push after the handcuffs were on also constitute a clearly established violation. *See, e.g., Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("For example, we have articulated a clearly established right to

be free from specific types of non-deadly excessive force, such as handcuffing an individual too tightly.")

In summary, assuming the incident unfolded as Plaintiff alleges, she has stated a claim under § 1983, as she has established the deprivation of rights secured by the Constitution, and there is no dispute that Defendant was acting under the color of state law. Taking Plaintiff's facts as true, any reasonable police officer would have understood that he was violating her clearly established constitutional rights. Accordingly, the Court finds that Defendant is not entitled to qualified immunity against Plaintiff's excessive-force claim.

### C. Fourth Amendment Unlawful Seizure/False Arrest Claim

#### 1. Violation of Constitutional Right

The Fourth Amendment protects against unreasonable searches and seizures and requires that arrest warrants be issued only upon a showing of probable cause. U.S. Const. amend. IV.

> For probable cause to arrest to exist, the "facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Whether there exists a probability of criminal activity is assessed under a reasonableness standard based on an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*. The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible.

*Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (emphasis in original, some internal citations and punctuation omitted), *see also Pyles v. Raisor*, 60 F.3d 21211, 1215 (6th Cir. 1995).

The question of whether or not Defendant had probable cause to seize and arrest Plaintiff can only be resolved by a jury. There are too many disputed facts for the Court to decide this issue as a matter of law. On Plaintiff's version of the facts, a reasonable jury could conclude that Defendant

did not have probable cause to seize or arrest her for disorderly conduct, resisting arrest, or interference with an emergency care provider at the scene of an emergency, for which Defendant urges in his summary judgment briefs probable cause existed. If the jury decides Defendant was indeed lacking in probable cause to arrest her, she will have succeeded at establishing that her Fourth Amendment rights to be free from unlawful seizure were violated.[1]

### 2. Constitutional Right Clearly Established

The Fourth Amendment right to be arrested only on probable cause has been clearly established by Supreme Court precedent for many decades. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Thacker*, 328 F.3d at 255 ("It is well established that any arrest without probable cause violates the Fourth Amendment.."). Thus, a reasonable officer would be aware that his conduct was unlawful in the situation confronted by Defendant, as alleged by Plaintiff. *See Saucier*, 533 U.S. at 202. Accordingly, Defendant is not entitled to qualified immunity on Plaintiff's unlawful seizure claim.

### III. The Plaintiffs' State-Law Claims

---

[1] Plaintiff argues that her arrest violated a state law providing that an officer can only arrest an individual for a crime committed outside his presence in certain enumerated situations, none of which, she claims, was present in this incident. Tennessee Code Annotated § 40-7-103(a)(1) provides that "[a]n officer may, without a warrant, arrest a person: for a public offense committed or a breach of the peace threatened in the officer's presence." If the facts are as Plaintiff presents them and she did not breach the peace in the officer's presence, she is correct that the arrest violated this Tennessee state law. Of course, on Plaintiff's facts, she also did not commit a crime *outside* of the officer's presence. But whether or not Defendant arrested Plaintiff in violation of state law, Defendant is correct that the Sixth Circuit has held with regard to the same "in the presence" requirement under Kentucky state law that a defendant "cannot be liable under § 1983 unless he violated one of [the plaintiff's] federal constitutional rights. [The plaintiff's] rights under [state] law, including her right as an alleged misdemeanant to be arrested only when the misdemeanor is committed in the presence of the arresting officer, are not grounded in the federal Constitution and will not support a § 1983 claim." *Pyles*, 60 F.3d at 1215.

In addition to her § 1983 claims, Plaintiff has asserted several claims against the defendants under Tennessee law. This Court exercises supplemental jurisdiction over those claims under 28 U.S.C. § 1367(a).

**A. Reckless Infliction of Emotional Distress**

Although Plaintiff's complaint alleges *reckless* infliction of emotional distress or "outrageous conduct," the state-law claim is called "intentional infliction of emotional distress," whether the conduct was alleged to have been intentional or reckless.[2] "The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.* 367 S.W.3d 196, 204 (Tenn. 2012).

As to the first element of this claim, based on Plaintiff's allegations a jury could find that Defendant's conduct was reckless, or even intentional. As to the second element, a jury could also find that Defendant's behavior was so outrageous as not to be tolerated by civilized society. Defendant cites *Bain v. Wells,* 936 S.W.2d 618 (Tenn. 1997), for the proposition that a successful claim for this tort will generally be "one in which the recitation of the facts to an average member

---

[2]

Although Plaintiff refers to this claim as "outrageous conduct," the Tennessee Supreme Court has held that

> Although the term "outrageous conduct" has gained widespread use as a substitute or shorthand for intentional infliction of emotional distress, it is more accurately and correctly used as referring to an element of intentional infliction of emotional distress. Because having two names for the same tort—"intentional infliction of emotional distress"—engenders potential confusion and misunderstanding and may lead to error, courts and litigants should no longer refer to "outrageous conduct" as a separate, independent cause of action, nor as a synonym for the tort of intentional infliction of emotional distress.

*Rogers,* 367 S.W.3d at 204.

of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'"*Id*. at 623. It is entirely possible that a reasonable jury could have just that reaction to the facts as alleged by Plaintiff.

As for the third element of this tort, the requirement that a plaintiff have suffered serious mental injury, the Court again turns to Tennessee law for guidance. After a lengthy discussion of the "severe mental injury" element, the Tennessee Supreme Court provided the following nonexclusive list of factors that may be deemed relevant to support a claim of intentional infliction of emotional distress:

> (1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;
>
> (2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;
>
> (3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;
>
> (4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;
>
> (5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and
>
> (6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.
>
> The plaintiff may present this evidence by his or her own testimony, the testimony of lay witnesses acquainted with the plaintiff such as family, friends, and colleagues, or by the testimony of medical experts.

*Id.* at 209– 10.

The Plaintiff has provided through her deposition testimony ample evidence from which a jury could conclude that she has suffered serious mental injury. Her primary care physician has

diagnosed her with PTSD or anxiety. Plaintiff's Depo. 318-19. She also described in her deposition having chest palpitations, "that feeling of dread," coming out of a sleep after having a dream and being unable to "get the thoughts of what happened out of my mind," "playing [the incident] through my head and wanting things to go differently and not understanding why what happened to me happened to me. I haven't been able to get past that." Id. 319. She describes a large number of serious health complications and chronic pain she has suffered as a result of the physical injuries she sustained on the day of this incident. She also describes at length all the things she cannot do that she used to do because of the risk of injury or pain, including throwing football, skiing, roller blading, gardening, fishing, and riding bikes, all things she used to enjoy doing with her children, and having intimacy with her husband. She even struggles to wash her own hair and apply her own makeup because of pain. Id. 352-55.

Because the Plaintiff's allegations, if believed by a jury, make out the elements of the tort of intentional infliction of emotional distress, Defendant's is not entitled to summary judgment on this claim.

### B. Assault and Battery

Under Tennessee law, a cause of action for assault and battery can be established when an officer causes damage by an excessive and unprovoked use of force. *City of Mason v. Banks*, 581 S.W.2d 621, 625– 26 (Tenn. 1979). Tennessee "recognize[s] the general rule that a presumption of good faith attaches to an officer's use of force in effecting an arrest and that he is not liable for damages unless the means he uses are 'clearly excessive.'" *Id*. at 625-26 (citing the Restatement (Second) of Torts § 132, Cmt. a (1965)). An officer is "privileged to use only that force necessary to effect the arrest" and is "liable for the damages caused by his excessive and unprivileged use of

force under the intentional tort of battery." *Id*. at 626. It does not matter whether the officer intended to injure the plaintiff, "for his use of that force, in an exercise of a conscious and volitional act, was an unprivileged intentional tort." *Id.* (internal citations to the Restatement (Second) of Torts omitted).

If a jury credits Plaintiff's evidence, it could conclude that she has proven her claim of assault and battery. Accordingly, summary judgment is not appropriate as to this claim either.

**C. Interference with Medical Care**

In her response to Defendant's motion for summary judgment, Plaintiff expressly abandoned this claim. (Docket No. 41, p.15 n.1)

**IV. Motion to Exclude Testimony on Plaintiff's Proffered Expert Phillip Davidson**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), the Supreme Court established the standard for admissibility of scientific expert testimony under Federal Rule of Evidence 702. *Daubert* requires that a trial judge ensure that all scientific testimony be "not only relevant, but reliable." *Id.* at 589. This requirement "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The Supreme Court has also applied this test to non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Mr. Davidson is qualified to testify as an expert on the issues presented in this case and can learn additional facts at trial to assist in his testimony. *See Champion*, 380 F.3d at 909 (holding district court did not abuse "its considerable discretion" in admitting expert testimony of a sociology professor with "considerable experience in the field of criminology" who

was "testifying concerning a discrete area of police practices about which he had specialized knowledge"). Defendant can make contemporaneous objects to specific questions at trial if necessary. Accordingly, Defendant's motion to exclude Mr. Davidson as an expert witness in this matter will be denied.

## CONCLUSION

Because there are too many material facts in genuine dispute for Defendant to prevail as a matter of law and the Court concludes that he is not entitled to qualified immunity for any of Plaintiff's claims, Defendant Michael Pyle's Motion for Summary Judgment (Docket No. 30) will be DENIED as to Counts I-IV of Plaintiff's Complaint and GRANTED as to Count V (interference with medical care) of her Complaint, which she has abandoned. Because Plaintiff's proffered expert is qualified to testify in this matter, Defendant's Motion to Exclude Testimony of Plaintiff's Proffered Expert Philip Davidson also will be DENIED.

An appropriate order is filed herewith.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE